[Cite as *In re Kail.K.*, 2018-Ohio-1548.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY


In re Kail.K., Kam.K., J.G.,          Court of Appeals No. L-17-1262
J.K., Ju.K., Kai.K.                          L-17-1263
                                          L-17-1264

                        Trial Court Nos.  AB 15250927
                                    AB 14243464
                                    AB 13235356

                        <u>**DECISION AND JUDGMENT**</u>

                        Decided:  April 20, 2018

* * * * *

Adam H. Houser, for appellant.

Angela Y. Russell, for appellee.

* * * * *

**SINGER, J.**

**{¶ 1}** This is a consolidated appeal from the October 10, 2017 judgment of the

Lucas County Court of Common Pleas, Juvenile Division, which terminated the parental

rights of appellant, I.K. ("mother"), to five of her children, Kail.K., Kam.K., J.G., Ju.K.

and Kai.K., and granted permanent custody of the children to appellee, Lucas County Children Services Board ("appellee" or "agency"). For the reasons that follow, we affirm the judgment.

{¶ 2} Mother set forth two assignments of error:

> 1. The Finding that the Child Could not be placed with Appellant Within a Reasonable Time was Against the Manifest Weight of Evidence as Mother had completed services and had the children in her care for over a year with protective supervision.

> 2. The Finding that the Child Could not be placed with Appellant Within a Reasonable Time was Against the Manifest Weight of Evidence as the Trial Court improperly considered Mother's use of marijuana as she has a legal medical marijuana card which is legal in the State of Ohio and was taking her medication as prescribed.

**Background**

{¶ 3} Mother has given birth to six children by five different fathers. Mother's children include: Kai.K., born in October 2006, Kail.K., born in January 2008, Kam.K., born in September 2009, J.G., born in September 2010, J.K., born in October 2012, and Ju.K., born in May 2014. Five of the children, Kai.K., Kail.K., Kam.K., J.G. and Ju.K., were the subject of the permanent custody proceeding in the Lucas County Court of Common Pleas, Juvenile Division. With respect to the sixth child, J.K., attempts were

2.

undertaken to place this child with a paternal relative. J.K. was not included in the permanent custody proceeding and is not the subject of this appeal. None of the fathers of the children were involved in the proceeding.

{¶ 4} The record shows appellee became involved with mother in July 2012, on a non-custody basis when appellee received a referral. Mother, who was pregnant with J.K., and her four children had moved to Lucas County from Cuyahoga County to escape a domestic violence situation, and were living in a shelter.

{¶ 5} In June 2013, mother sent four of her children away; appellee filed for protective supervision of the five children, which was granted.

{¶ 6} On September 24, 2013, appellee filed a complaint in dependency and neglect with respect to the five children, under case No. JC 13235356. Appellee alleged mother was offered domestic violence and parenting services and the children were offered counseling but mother was uncooperative with counseling for the children and minimized the domestic violence situation. In addition, mother was, at times, uncooperative with appellee and resistant to participating in services. On October 8, 2013, appellee filed an amended complaint seeking temporary custody of the five children.

{¶ 7} On November 20, 2013, adjudicatory and dispositional hearings were held. The five children were adjudicated neglected and dependent and appellee was awarded temporary custody. The five children were placed in foster homes. Case plan services

3.

for the family were established requiring mother to complete parenting and domestic violence services, and the children to participate in counseling.

{¶ 8} On October 8, 2014, appellee filed a complaint with respect to Ju.K., the youngest child who was born extremely premature and weighed 1.1 pound, in May 2014, and remained in the hospital until October 2014. Temporary custody of Ju.K. was granted to appellee under case No. JC 14243464.

{¶ 9} On August 12, 2015, legal custody of Kai.K., the oldest child, was awarded to a paternal relative. However, in October 2015, temporary custody of Kai.K. was again granted to appellee, and a new complaint was filed in case No. JC 15250927.

{¶ 10} On October 20, 2015, four children (not including Kai.K. or Ju.K.) were returned to mother with protective supervision granted to appellee.

{¶ 11} In April 2016, appellee moved for permanent custody of Ju.K, the youngest child, in case No. JC 14243464. A trial was held in July 2016, and the motion was denied.

{¶ 12} In mid-October 2016, mother and the four children living with her moved to a shelter because mother's boyfriend ("boyfriend") wrecked the apartment and had destroyed and stolen some of mother's and the children's belongings. Appellee received a referral. Appellee had no knowledge that mother had a boyfriend.

{¶ 13} On November 30, 2016, in case No. JC 14243464, appellee filed a motion for permanent custody of Ju.K.

4.

{¶ 14} On December 8, 2016, appellee filed a motion to change disposition of the four children living with mother in the shelter; an emergency shelter care hearing was held and the four children were removed from mother's care and placed in foster care.

{¶ 15} On February 24, 2017, in case No. JC 15250927, appellee filed a motion for permanent custody of Kai.K.

{¶ 16} On May 10, 2017, in case No. JC 13235356, appellee filed its motion requesting modification of temporary custody of Kail.K., Kam.K., J.G. and J.K., to permanent custody.

{¶ 17} On August 7, 8, 11, 15 and 18, 2017, the court held the permanent custody hearing. On August 25, 2017, the court announced its decision that appellee had met its burden, and ordered permanent custody of the five children (not including J.K.) be awarded to appellee.

{¶ 18} On October 10, 2017, the court issued its judgment entry in which it granted permanent custody of the five children (not J.K.) to appellee.

### Permanent Custody Hearing

{¶ 19} Appellee called numerous witnesses to testify at the permanent custody hearing, as did mother. The relevant testimony is summarized below.

### Caseworkers

{¶ 20} Chrishanna Osley, an on-going caseworker for appellee, testified to the following. She was assigned to work with mother and her family in July of 2012, on a non-custody basis. At that time, mother was pregnant with her fifth child and was living

with her four children in a shelter in Toledo, Ohio, as mother and the children had left a domestically violent situation in Cleveland. There were also concerns that Kai.K., the oldest child, was acting out sexually towards the siblings.

{¶ 21} Mother was referred to domestic violence and parenting services and the children were offered counseling. Mother refused to sign a referral for the children to complete non-offending group counseling, and therapy for children who witnessed violence. In addition, mother did not complete the domestic violence or parenting services to which she was initially referred, and had to be re-referred. Although protective daycare for the children was offered so that mother could attend appointments, mother's attendance at appointments was an issue.

{¶ 22} In June 2013, appellee was concerned because mother was not following through with certain services for the children, and mother was sending the children out of town to stay with different relatives. Mother told Osley the children were already gone, but Osley and her supervisor went to mother's home and found the children there. Two days later, appellee filed for protective supervision of the five children, but four of the children had been sent out of town. Kai.K. was sent to Florida with his paternal grandmother and three children were sent to Cleveland with their fathers, one of whom was a domestic violence concern. Appellee was granted interim temporary custody of the children, and Osley assisted in returning the children to Lucas County. Appellee was then awarded protective supervision of the five children while the children lived with

6.

mother. Then, in November 2013, appellee was awarded temporary custody of the five children.

{¶ 23} Osley remained on the case until February 2014, when mother requested another caseworker. Mother disagreed with Osley on certain issues and would use profane language when talking to Osley on the phone and face-to-face. For instance, Osley would have to speak with mother about the children being unattended at the shelter, as well as the living conditions, and mother would get upset and use profanity. During the time Osley was on the case, mother moved about three times, which included a move to Michigan, in about October 2013, for a couple of months.

{¶ 24} Laura Rubley, another on-going caseworker for appellee, testified to the following. She was assigned to work with mother and her family from February of 2014 until August 2016. During that time, mother completed domestic violence, parenting and substance abuse services, attended mental health services and the five children received counseling. Rubley had no concerns that mother had ongoing substance abuse issues. Mother lived in five places and dated at least three men. Ju.K. was born extremely premature and was hospitalized for five months before being placed in appellee's care. Ju.K. was medically fragile and attended three types of therapy. Appellee deemed it was not safe for Ju.K. to go home with mother.

{¶ 25} Rubley recommended four of the six children return home to mother. It was not recommended that Kai.K. return home because he had anger issues and was physically aggressive with his siblings and was a safety risk. It was recommended that

7.

legal custody of Kai.K. go to the paternal grandparent, but the placement did not last long.  On Kai.K.'s birthday, Kai.K. and his father, who has a criminal record, got into a physical altercation, then later, Kai.K. became physically aggressive with his grandmother and threatened to smash her head in.

{¶ 26} In October 2015, four of the children returned to mother's care, and appellee had protective supervision.  Protective daycare was offered, but mother would not make the children available regularly.  Individual and family counseling were also offered, and mother engaged in November and December 2015, then re-engaged in July or August 2016.

{¶ 27} A permanent custody hearing for Ju.K. was held and denied.  Appellee then added housing and resource management services to the case plan and linked mother with parenting assessment and a community advocate.  Mother only availed herself of the community advocate.

{¶ 28} Rubley had discussions with mother regarding choosing an appropriate partner and mother indicated the domestic violence treatment taught her to recognize certain red flags.  In July 2014, mother informed Rubley that mother had been involved with a man, R.W., for four or five months.  Rubley investigated R.W., and he was approved by appellee.  R.W. was in and out of mother's life for several months, then mother dated another man, but broke up with him in July or August 2016.

8.

{¶ 29} Rubley was removed from mother's case in August 2016, because mother felt after Ju.K.'s permanent custody hearing she wanted a new caseworker. This was not typical.

{¶ 30} Anita Ofori testified she is a caseworker for Harbor Behavioral Health Care, and met with mother in February or March 2017. Ofori gave mother a form to complete to receive furniture, but mother never returned the form despite Ofori's attempts to contact mother by phone.

{¶ 31} Amanda Mellott, another on-going caseworker for appellee, testified to the following. She was assigned to work with mother and her family at the end of August 2016. The initial case plan was used and it included parenting help, as there were ongoing concerns with some of mother's parenting issues, counseling for mother and the children, stable housing, attendance at appointments and Ju.K.'s medical needs. At first, mother was regularly attending therapy appointments for Kai.K. and Ju.K., and was a little more consistent with getting her other children to their therapy appointments. Mother was provided with a community advocate, and was involved with the parenting assessment through appellee.

{¶ 32} In September 2016, Mellott and the GAL went to mother's apartment for an announced visit. Prior to the visit, mother had told Mellott she had bed bugs. Mellott observed mother had made dinner on a hot plate which was connected to an extension cord, plugged in in the hallway. There was food all over the table and the floor and the children were getting up and down from eating. The apartment was dark except for one

9.

light by the door, also plugged into the extension cord. At times, the children were in the dark rooms. Mother said there was no electricity in the apartment because maintenance had removed a box from the wall that day. The rooms were unkempt and in disarray. Mellott saw bugs and/or roaches in the building. Mellott had concerns with mother's housing, including the lack of electricity, but mother said she had put a deposit down on a new place. As another option, mother said she would go to a shelter.

{¶ 33} In early October 2016, appellee had recommended reunifying Ju.K. with mother. However, about a week and one-half later, a domestic violence situation with mother's boyfriend occurred and the family moved to a shelter. Mellott did not know mother was in a relationship. When asked about her boyfriend, mother at first said he was just a friend and did not live with her, he just stayed overnight four or five times and did not have any unsupervised contact with the children. Mother acknowledged she knew about boyfriend's substance abuse history and that he was in recovery.

{¶ 34} Regarding the domestic violence situation, mother said boyfriend broke into the apartment, basically destroyed it and threatened to harm the family. Mother said the children were not home at the time. Mother also admitted boyfriend was physically abusive. Mother filed a police report in which she said boyfriend threatened to rape her and her daughter and hurt them. Mother never followed through with getting a protective order against boyfriend. Mother said she had no contact with boyfriend; when he tried to call from jail she would not answer his calls. Mother said she was going to change her phone number.

10.

**{¶ 35}** While at the shelter, mother told Mellott she and the children went to the hospital because they thought they had scabies, but it turned out to be allergies.

**{¶ 36}** Mellott spoke with boyfriend several times while he was in jail and his facts remained constant. Boyfriend said he lived with mother from August until October 2016, he had a key to the apartment, he was alone with the children and he and mother had used marijuana. Boyfriend stated he was still in a relationship with mother and they continued to speak with each other often. Boyfriend told Mellott she could get the tapes to listen to his jail phone calls with mother. Mellott secured a copy of the calls, and listened to the jail calls. In the calls, mother and boyfriend were flirtatious, they talked about sex and drugs, mother said she loved boyfriend and would wait for him. In some of the calls, children could be heard in the background. In one call, mother told boyfriend he should be checked for scabies. Mellott noted boyfriend was not at the shelter, so this condition occurred before mother went to the shelter. When Mellott asked mother about the calls, mother said the detective investigating the burglary charge against boyfriend told mother to talk to boyfriend to help the case. However, Mellott spoke with the detective and he said he never told mother to talk to boyfriend.

**{¶ 37}** In December 2016, appellee filed a motion for custody of the four children in mother's care. Appellee obtained emergency custody of the children on December 8, 2016. At the shelter care hearing, mother was ordered to undergo a drug test; the result was positive for marijuana. Thereafter, Mellott requested that mother undergo eight drug tests, but mother was only tested one time; the result was negative.

11.

**{¶ 38}** Mellott was unable to locate mother after the four children were removed, until January 2017, when mother called. Mother missed a month of appointments as well as visits with her children, who had been traumatized by their placement in foster care. The four children all had issues with bedwetting and sexualized behavior and were enrolled in counseling. Appellee recommended mother undergo substance abuse, mental health, domestic violence and parenting services and secure housing and employment. Mother agreed to undergo a substance abuse assessment, but this was never accomplished so she was not referred for parenting services. Mother did secure housing and employment. Mother refused to undergo domestic violence services.

**{¶ 39}** After the children were removed, mother's attendance at appointments for Ju.K. and Kai.K. was minimal, even after mother had a vehicle. During mother's visits with the children, mother focused on one child at a time, so the other children were left to care for themselves and/or appellee's officer looked after them. In addition, the level of supervision for mother's visits increased from Level 2 to Level 1 because mother was discussing inappropriate, adult information with the children. Mother often brought foods high in sugar, pizza, candy and cookies to visits even though mother was informed about Ju.K.'s sugar and protein issues. Mother stated she wanted to spoil her children.

**{¶ 40}** Mellott spoke to mother numerous times about mother's marijuana use, and mother admitted using marijuana while the children were in her care. In June 2017, Mellott learned that mother was pursuing medical marijuana, and in July 2017, mother said she had a temporary card but could not produce it.

12.

**{¶ 41}** Although the children are bonded with mother, they are also bonded with their current placements and are stable. The children reported during the time boyfriend was at the home that they were fearful of him, there was yelling and arguing and mother cried a lot. They were also able to watch movies which were very scary and had nudity and sex scenes while mother was in the bedroom. During the time Mellott worked with mother, mother lived in three different places, and since the case opened in 2013, mother has lived in 14 places.

**{¶ 42}** Mellott stated appellee was seeking permanent custody of the children due to concerns with mother's insight, mother's failure to complete case services, mother's inconsistent attendance at Kai.K. and Ju.K.'s therapies, mother's failure to take responsibility for her decisions and actions, which continue to put her children at risk, and mother's failure to modify her behavior to alleviate concerns of being involved in domestic violence relationships. Mother made minimal progress in dealing with her issues. As to the children's fathers, none of the fathers were involved, however, J.K.'s paternal aunt was interested in legal custody of J.K.

### Detective

**{¶ 43}** William Moore testified he was employed by the Toledo Police Department as a detective. Moore investigated the alleged burglary of mother's apartment in October 2016. Moore never told mother to contact boyfriend because Moore had already investigated the crime. Moore said boyfriend claimed the door was unlocked, and pretty much confessed.

13.

**Ju.K.'s Early Intervention Specialist**

{¶ 44} Stephanie Mann testified to the following. She is an early intervention specialist. Early intervention became involved with Ju.K. in or about July 2015, and Mann started working with Ju.K. in 2016. Ju.K. was born at 24 weeks and was developmentally delayed in all areas. Ju.K. received therapies while in her foster home, and Mann worked with mother at supervised visits with Ju.K. to assist mother in learning about Ju.K.'s special needs.

{¶ 45} At visits, mother held Ju.K. and was sometimes engaged in learning about Ju.K.'s needs. When three of mother's other children were also at visits, it was overwhelming. Mann noticed during visits, mother was often sitting in a chair and making phone calls. On two occasions, mother asked Mann to stop attending visits because it was mother's only time with Ju.K. Mann stated Ju.K.'s development is still delayed, but she is making progress. If Ju.K. did not have therapies, Ju.K. would be even further delayed. Mann opined that usually such premature children are in therapy at least until the age of seven or eight.

{¶ 46} Ju.K. had new medical issues, as her liver was not functioning properly so her sugar and protein intake must be closely monitored. The condition was getting worse, so the foster parents kept track on a daily basis of Ju.K.'s sugar levels. The foster parents noticed Ju.K.'s sugar levels were always high after visitations with mother, which

14.

was a concern for months. Mann estimated the foster parents spend about five to six or more hours a day working with Ju.K. After observing mother at visits, Mann believed mother would have difficulty handling Ju.K. with four other children, including getting Ju.K. to all of her appointments.

## Ju.K.'s Therapists

{¶ 47} Ann Nagle testified she is a physical therapist and has worked with Ju.K. since the child was six months of age. Nagle said Ju.K. has extensive needs and has made progress, but is still delayed. Nagle said it would be detrimental to Ju.K. if there was no follow- through at home for Ju.K.'s issues. Since every session builds on the next, Nagle said it is critical to attend the sessions. Nagle noted mother attended some of Ju.K.'s appointments, but her attendance was erratic, and mother had not attended any appointments in months.

{¶ 48} Kim Long testified she is a speech/language pathologist and worked with Ju.K. for about a year. Long sees Ju.K. once a week for an hour and Ju.K. has made a lot of progress. Mother did not consistently attended Ju.K.'s appointments.

{¶ 49} Patricia Rogers testified she is an occupational therapist assistant certified and has worked with Ju.K. for probably a year. Rogers sees Ju.K. every other week and Ju.K. has progressed. Rogers noted Ju.K. was 39 months old but functions closer to a 23 month old. Rogers had seen mother at Ju.K.'s appointments in the past, but mother had not attended in several months. Rogers opined it was critical for mother to be present at Ju.K.'s sessions so mother can learn what to do with her child.

15.

## Kai.K.'s Clinical Therapist

{¶ 50} John Davis testified to the following. He is a clinical therapist who has worked with Kai.K. at school from 2014 to the present. Davis works with Kai.K. on emotions and behavior management and social skills so that Kai.K. can be successful at school and home. Kai.K. was diagnosed with attention deficit hyperactivity disorder ("ADHD"), posttraumatic stress disorder ("PTSD"), depressive episodes and parent child relational problem. Kai.K. has difficulty with anger management, has explosive episodes involving verbal and physical aggression, has oppositional behaviors and is disrespectful.

{¶ 51} Kai.K. is in a program at school for children with severe emotional difficulties and behavioral problems. At school, Kai.K. has thrown tables and chairs, stormed out and fought with other students. A treatment team is in place to help Kai.K. through group counseling, individual processing opportunities and classroom instruction with behavioral modification incentives. Although Kai.K. has seen a therapist since 2012, his progress has been inconsistent. Mother was asked to attend Kai.K.'s counseling sessions, and has attended some.

## Kai.K.'s Psychiatrist

{¶ 52} Dr. Ted Hunter, a child and adolescent psychiatrist, testified to the following. He has provided psychiatric services, including medication, to Kai.K. since November 2015, and sees Kai.K. about once a month. Kai.K. has been diagnosed with PTSD, ADHD and unspecified depressive disorder. Kai.K. has a lot of anger and irritability, and almost every day has aggression and behavioral outbursts.

16.

**{¶ 53}** Dr. Hunter understood that Kai.K. had been exposed to domestic violence, emotional violence and inappropriate sexual exposures, where Kai.K.'s father forced Kai.K. to watch father have sex to learn how to be a man.

**{¶ 54}** During the time Dr. Hunter has treated Kai.K., Kai.K. has been hospitalized approximately seven times due mainly to Kai.K.'s outbursts, destruction of property and threats to hurt himself and others including his siblings. Kai.K. will need treatment for the foreseeable future for his issues. With stability, consistency and keeping appointments, Dr. Hunter opined that Kai.K.'s prognosis was fair. Dr. Hunter has not met mother.

### Shelter Employees

**{¶ 55}** Tyese Wilson testified she worked at the YWCA domestic violence shelter as the volunteer coordinator, case manager and shelter manager. She was assigned to work with mother in October 2016, when mother and her four children arrived at the shelter after mother's boyfriend completely destroyed the apartment. Wilson had numerous discussions with mother regarding having contact with the perpetrator (boyfriend); mother denied having any contact with boyfriend.

**{¶ 56}** During the time she was at the shelter, mother had issues regarding behavior, such as fighting with other clients, maintaining a clean room, as her room was filthy, not obtaining a protective order and marijuana use outside of the shelter. Mother was at the shelter for less than 60 days, when she was asked to leave for giving false information and having contact with boyfriend, her abuser, while he was in jail. Wilson

17.

learned about the false information and contact with the abuser at an emergency meeting held by appellee in December 2016; mother had asked Wilson to attend the meeting. A recording of the phone calls between mother and boyfriend was played, while mother was at the domestic violence shelter and boyfriend was in jail; children could be heard in the background. Mother said the detective requested that she talk to boyfriend. Mother was told to leave the shelter immediately, which she did.

{¶ 57} Wilson had to help clean mother's room after mother left the shelter. Wilson described the room as horrible with clothes were everywhere, a bucket full of water and dirt, the smell of urine and smelly bags containing clothes which made Wilson sick to her stomach. Mother's room was the worst Wilson had dealt with. Wilson said there was no mold in the rooms at the shelter. Wilson also said the shelter has a free washer and dryer, and the shelter provides laundry detergent and dryer sheets.

{¶ 58} Gwyn Hager testified she worked at the YWCA domestic violence shelter as a child advocate. Hager worked with mother's four children and spoke with mother several times to assist mother in maintaining custody of the children. Hager did not notice any issues with mother's interactions with the children. Hager attended two or three meetings involving the children and reviewed the case plan with mother; mother said she would follow all plan requirements.

{¶ 59} Hager was at the December 8, 2016 meeting and learned mother had been lying. Hager was surprised because she had trusted mother. After hearing the recording of the jail calls between mother and boyfriend, mother denied what she had done. After

18.

hearing the calls, Hager was concerned for the children's welfare because Hager had relied on what mother had said about caring for the children, but mother could no longer be trusted. Hager agreed the children should be removed from mother's care.

{¶ 60} Hager assisted in packing up and cleaning mother's room after mother left the shelter. Hager said mother's room was one of the most disgusting rooms that Hager had packed up. Hager stated there were clothes everywhere, dirty clothes, dirty bedding, piles of stuff under the beds and an odor in the room. Hager packed up at least ten bags of clothes. It took about three hours to clean the room.

## Security Guard

{¶ 61} Jeffrey Chesser testified he works security for appellee and has supervised mother's visits with her children for about six months. During visits, mother brings food and sits at the table and interacts with a child while the other children do their own thing. If Ju.K. is at the visit, she is mother's main focus. The children go to mother to have interaction with her. Chesser has to do some of the parenting that mother should be doing at every visit because he has had to intervene when a child was throwing things, eating off of the floor or couch or putting a plastic bag on her head.

## Boyfriend

{¶ 62} Boyfriend testified he met mother on-line in December 2015, and met her in person in early August 2016, at the library. After meeting, boyfriend went home with mother and her four children. Boyfriend slept on the couch the first two nights, then moved into mother's bed. Mother quit her job when boyfriend met her, and she lived on

19.

social security and food stamps. Boyfriend was not aware there were roaches in the apartment, but did know there were bedbugs. Boyfriend stayed at mother's apartment during their relationship except for one week when mother kicked him out.

{¶ 63} When boyfriend returned to mother's apartment there was no electricity because she did not pay the bill, and there was an eviction notice on the door because the rent was not paid. The only electricity for three weeks was from an extension cord running out into the hallway. There was a candle for light in the bathroom. Boyfriend and mother shared a key to the apartment. Boyfriend helped with groceries and paid the cable bill, which was in his name, as mother could not get cable because she owed money. Boyfriend pled the fifth when asked what his source of income was.

{¶ 64} Boyfriend smoked marijuana with mother daily in the bedroom and sometimes the four children would walk in. Boyfriend was on methadone for his previous heroin addiction and admitted snorting cocaine in mother's bathroom multiple times. Boyfriend stated he was under the influence daily, which mother knew. During the time he was with mother, mother did not have a prescription for Oxycodone or Percocet.

{¶ 65} Boyfriend said mother did not physically abuse her children, but she did spank them a handful of times. Boyfriend did not physically discipline the children, but did raise his voice at them. Boyfriend got the children off of the bus by himself on occasion. The children did not have a bedtime, "they usually crashed on their own. It was nothing too late, no."

20.

{¶ 66} When mother had visits with her children at the agency, boyfriend would go to the library because he was not supposed to be seen by appellee. Mother had said she was not supposed to be dating a meth addict that appellee did not know about. However, boyfriend did go with mother to Kai.K.'s therapy appointments. Kai.K. asked if boyfriend was "mommy's new boyfriend," to which mother said no and boyfriend nodded yes.

{¶ 67} The relationship lasted until mid-October 2016, when an incident occurred and boyfriend was arrested for aggravated menacing. Boyfriend said he destroyed two TVs, a play station, flipped a table and threw things off of a shelf in mother's apartment when no one else was there. Boyfriend did admit he "put hands on" mother two days before this incident and the children were in the living room. He was later charged with burglary.

{¶ 68} After he was arrested, boyfriend spoke on the phone with mother about 15 times, from November through December 2016, and mother accepted the calls. The jail tapes were played and boyfriend identified mother's voice as well as his voice. He admitted to talking with mother about sex and drugs while children could be heard in the background. Boyfriend also acknowledged meeting with Mellott twice and Rochellee Abou-Arraj once while he was in jail.

{¶ 69} After the children were removed from mother's care in December 2016, boyfriend still had contact with mother. Boyfriend had cut off his ankle monitor and was on the run. On January 23, 2017, he was in a psychiatric hospital and talked to mother on

21.

the phone; they were supposed to meet. However, boyfriend was arrested on outstanding warrants and did not see mother.

{¶ 70} In January 2017, mother told boyfriend she was pregnant and he believed her until two or three weeks past what should have been the due date in June 2017. Mother also told boyfriend's mother about the pregnancy so boyfriend's mother contacted appellee to be considered as a placement for the baby. Boyfriend said mother lied about being pregnant and "everything she seems to say is lies. It's all lies."

## GAL

{¶ 71} Rochellee Abou-Arraj testified to the following. She was appointed as the guardian ad litem ("GAL") in August 2016 to represent all of the children. Abou-Arraj undertook an investigation and prepared a report, filed July 31, 2017, wherein she recommended that appellee receive permanent custody of all of mother's children, as it was in the children's best interest.

{¶ 72} The case plan objective was for mother to maintain in the home the four children living with her, and to reunify Kai.K. and Ju.K. Abou-Arraj and caseworker Mellott had concerns with mother's apartment in September 2016, and were not comfortable reunifying Ju.K. with the family at that apartment. Mother assured the GAL and Mellott that she, mother, had put a deposit down on a home in Point Place. At that time, mother denied that she was in a relationship with anyone.

{¶ 73} At a meeting held on December 7, 2016, mother vehemently denied boyfriend's allegations that he lived with mother and the children, cared for the children

22.

or had contact with mother since the October 2016 incident. When Abou-Arraj produced the jail calls, mother said the detective told her to have contact with boyfriend to obtain more information on boyfriend. Abou-Arraj then spoke with the detective who absolutely denied it and stated he had enough evidence. Mother also insisted she could not get a protection order because of the rule that she could not provide the address of the shelter. However, the advocates had never heard of such a rule, and if mother had asked, they would have assisted mother. Abou-Arraj said mother's veracity and honesty diminished greatly as a result of the whole process.

{¶ 74} Regarding boyfriend, Abou-Arraj thought he was credible in the jail interview, at the post dispositional hearing and at trial. Boyfriend provided details regarding the four children who lived with mother and Kai.K., as well as using substances with mother while the children were in the home. Abou-Arraj did not know mother was using marijuana until boyfriend mentioned it, and it was only in the early summer of 2017 that Abou-Arraj learned from Mellott about mother using medical marijuana.

{¶ 75} The two advocates at the shelter were aggressive in advocating for mother and attended meetings for mother. When the advocates discovered mother was still in contact with boyfriend, they were very upset that mother had been dishonest and deceitful.

{¶ 76} Kai.K. has extreme anger and requires consistent counseling. Mother needs to attend Kai.K.'s counseling sessions to learn techniques and skills to help him.

23.

At the time of trial, which was mid-August 2017, mother had only been to one of Kai.K.'s sessions since early 2017. Kai.K. was very happy in his current placement, and is very supported by his foster mother as well as neighbor across the street who is employed by the fire department. Kai.K. does want to return to mother.

{¶ 77} Ju.K. was a micro premie with special needs who attends physical, speech and occupational therapies. The therapies are critical for Ju.K., as she has numerous delays. Mother must participate in the therapies in order to understand Ju.K.'s development and learn skills to help her. At the time of trial mother had attended some sessions in 2016, and only one session in early 2017. Ju.K. was in a new foster home and doing well. Ju.K. goes to therapy and medical appointments, including for the potential diabetic and pulmonary issues. Ju.K. was too young to express where she wanted to live.

{¶ 78} Kail.K. and Kam.K. were in a foster-to-adopt home together and were very happy. They are in counseling and their behaviors are improving, including the sexual acting out, but there is still some bedwetting. Kail.K. and Kam.K. want to return to mother.

{¶ 79} J.G. was in a foster home where he was doing well, and the family is willing to adopt him. At times, J.G. has expressed his wish to be reunited with mother, but more recently, he wished to live in his current foster home.

{¶ 80} Abou-Arraj noted stable housing was an issue for mother, as well as the conditions within the house. Mother's apartment was not good and was inappropriate for children because there were bedbugs and it was dirty. Mother's room at the shelter was

24.

horrible as far as the cleanliness and the smell. Domestic violence was also a serious concern.

{¶ 81} Abou-Arraj recommended that appellee receive permanent custody of five of the children, excluding J.K., as it was in the children's best interest. Although mother loves the children, the children need extended therapies that mother is not able to provide. Abou-Arraj did not believe mother has modified her conduct such that she could provide a safe environment and ensure domestic violence would not affect the children if the children were returned to mother's care.

### Mother's Therapist

{¶ 82} Holly Revel-Hough, a clinical therapist who has worked with mother since November 2016, testified to the following. Mother was diagnosed with PTSD, major depression and generalized anxiety disorder. Mother attends trauma therapy weekly. Mother completed a childhood trust event survey which showed she had experienced 22 traumas including: being separated from family; having family in prison or taken away by police; being bullied; neglect; suicide; drug or alcohol abuse in the home; mentally ill family member; physical violence; threats of physical violence; emotional abuse; being kidnapped; seeing a friend killed; being a crime victim; and, sexual abuse. Trauma therapy is difficult but mother was opening up, was doing very well and for the most part has followed through.

## Family Visit Monitor

{¶ 83} Rhonda Harris testified she works for appellee as a family visit monitor who observed mother's visits with her children from 2013 until maybe 2016, for Level 2 visits. Every eight to ten minutes, Harris would walk around to make sure visits were going well. Harris said the children were clean when they arrived for visits, although their hair may not have been combed. The children did not have medical issues, fevers or bruises. The children's behavior remained the same. Mother brought food to the visits like chicken and meatloaf or ordered pizza or burgers. During visits, mother would sometimes engage with the children.

## Parenting Educator

{¶ 84} Pamela Welch testified she works for appellee doing parenting education classes and parenting assessments. Welch initially met mother and the children in September 2016, for a parenting assessment to determine if mother needed parenting education classes. From September through December 2016, Welch attended about 12 visitations at the agency between mother and her six children, but not all six children at once. Welch said mother managed her children quite well at the agency visits. Welch concluded mother did not need parenting classes because mother demonstrated coping skills, managing her feelings, understanding discipline options, redirecting her children, understanding her children's basic needs and providing for those needs during parenting time. During the time that Welch assessed mother, Welch did not know mother was

taking drugs or involved in a domestic violence relationship. In addition, Welch did not go the mother's home, as the visits only occurred at the agency.

**Mother**

{¶ 85} Mother testified to the following. She reached out to appellee in 2012, when she was staying in a shelter which had limited services to help her. She was in the shelter after "leaving a domestic violence -- financially domestic violence situation" in Cleveland. Appellee assigned a caseworker and established a case plan for the family which included services for children who witnessed domestic violence, services for physically abused parents, parenting classes and meetings for domestic violence survivors. Appellee was concerned about the children acting out sexually because Kai.K. humped Kail.K. on a bed with their clothes on. Mother asked Kai.K. why he would do something like that and Kai.K. said he saw it on TV at his dad's house. At that time, Kai.K. was in counseling due to moving and leaving his dad. Mother said the original case plan said Kai.K. saw something on TV at his dad's house, "and from that it was porn, that his father was having sex acts. This is all from just [Kai.K.] saying he saw something on TV."

{¶ 86} Mother stayed in the shelter until April 2013, when she moved with her children to a four bedroom house on Collingwood in Toledo. At the time, mother was working in Toledo and had a second job in Michigan but she never moved to Michigan. Mother reached out to appellee and had a community advocate worker to help get furniture, but "they would not return my phone calls. Not they, Chrishanna Osley.

I couldn't get any assistance so I ended up doing it myself." Mother later stated the shelter helped her move and receive furniture.

{¶ 87} In or about June 2013, mother said four of her children were going on vacation because they had not seen their family for the year they were in Toledo; three children were going to Cleveland, Kai.K. was going to Florida and J.K. was staying as she was too young to travel. Mother saved for the bus tickets and "[i]t was expensive to send five kids away." The day before the children were to leave, mother said Osley and "Ms. Strickland" went to mother's home and told her they heard the children were leaving town while mother had an open case with appellee. Mother said she did not have an open case, it was voluntary as she just asked appellee for help. "[T]here was an altercation * * * Osley stated she could make it an open case if I sent my kids away." Mother did send the children away and a case was opened, an emergency meeting was held and appellee removed the children from mother's care. The reason given, according to mother, was she did not send the children to CAC, the children advocate. Mother went down to CAC, but Osley said mother did not go. Mother said Osley was not following up so mother "could not see a doctor without having a referral from somewhere. So then she was forced to put the referral in." This occurred after the children were removed from mother's care.

{¶ 88} A case plan was prepared for mother and consisted of "another domestic violence class," parenting, trauma therapy, regular therapy, scheduling Kai.K. appointments, visits, drug treatment and children's therapy. Mother quit her job to redo

28.

her case plan and lost the house because she could not pay the rent. In the fall of 2013, mother moved into a shelter where she lived for about four months. Mother visited the children during this time. Kai.K. started having minimal behavior problems and was sent to Rescue Crisis for crying inconsolably, then he was suicidal; he was five years old. Kai.K. got worse.

{¶ 89} Mother moved again to Collingwood and was doing her case plan even though her physical health was horrible. Mother did not know she was pregnant as she had an IUD and negative pregnancy tests. However, mother passed out at a parenting class and went to the hospital and found out she was 23 weeks pregnant and needed an emergency Cesarean section.

{¶ 90} Ju.K. was born in May 2014, and mother was homeless and had no employment. Mother left the hospital and stayed at a shelter for a couple of months. Mother then became employed and obtained a four bedroom house. Kai.K. found out mother was visiting Ju.K. every day in the hospital and he threatened to kill the baby. Therefore, Kai.K. never visited with Ju.K. Mother did not think Kai.K. was a danger to his siblings, even though he said he would kill them: "I think his bark is bigger than his bite, and I do believe he has behavioral issues, but I think his biggest wish is to go home." When Ju.K. was released from the hospital after six months, appellee took custody of her.

{¶ 91} During 2014, there were additional allegations about sexual behaviors with the children. Mother said it was because J.G. and J.K. were laying with each other in

29.

bed, and sometimes J.K. would lay on top of J.G. Kail.K. and Kam.K. would also get into bed together. Mother talked to the children who said they just sought each other out for comfort. The claims were found to be unsubstantiated.

{¶ 92} In 2015, mother moved from a residence on Moore Street to a residence on Elgin because she was given a bigger case plan. She had to sacrifice her employment and she lost her car. All of the children were in school at that time and were on the honor roll and received numerous awards for their polite behavior.

{¶ 93} In October 2015, four children were returned to mother, but mother lost her insurance "because it was a red flag by Medicaid because there were too many insurances in a household." The children did not go therapies and counseling for several months due to the loss of insurance. Mother said, "I lost my kids when I got the kids at the same time" when the children were returned. Mother was happy to have her children back, but it was horrible because the GAL and caseworker would constantly pop up at home and at school, which scared the children. Mother would have to sometimes drag the children to visit Kai.K. because they were scared.

{¶ 94} More case plan services were added to reunify Kai.K. with Ju.K., and to address Kai.K.'s trauma which occurred at Kai.K.'s grandmother's house when Kai.K.'s father beat up Kai.K. and caused bruises.

{¶ 95} In 2016, after mother was evicted, she moved to an apartment on Bancroft, which was horrible. "They didn't fix anything. It was dirty. * * * But it was * * * on the bus line" so mother could get the children to school and services. Mother said she always

30.

had utilities when she lived at the Bancroft apartment, but the circuit box was removed and not fixed for a week. Mother was not evicted from the Bancroft apartment; she gave her 30 day notice after boyfriend destroyed it.

{¶ 96} Regarding boyfriend, mother met him on-line in December 2015, and talked to him every day on the computer. They met in person in August 2016, and "[w]e didn't have enough time to actually say we know each other boyfriend and girlfriend." It was for six weeks and "we did have sexual encounters." Mother stated boyfriend did not live with her; he lived at a boarding house by the Craig Street Bridge. He did not have a key to mother's apartment but he did put the cable in his name because mother owed money. Mother paid for the cable. Mother never left boyfriend in charge of the children as "[t]hat was one of the red flags I had. He was too eager to meet my kids, he just wanted to be a dad right off of the bat." During their time on Bancroft, mother said the children never reported seeing boyfriend or knowing who he was.

{¶ 97} Mother agreed that prior to the domestic violence incident with boyfriend, appellee had created a plan for Ju.K. to spend more time with mother. When mother was asked by the GAL if mother was told her apartment was not appropriate, mother stated, "I discussed about maybe going to a shelter because I had to go homeless or be evicted from my home to receive housing. And I was not homeless or getting evicted so I would have to be homeless to get better housing."

{¶ 98} The week before boyfriend destroyed the apartment, he was texting mother and hounding her, but she told him she could not talk to him anymore. When mother

31.

found the apartment destroyed, she picked up the four children at school and took them to a shelter.

{¶ 99} Mother said boyfriend lied when he testified they had sex 70 times in 60 days. Mother was never pregnant by boyfriend, nor did she tell boyfriend that she was pregnant. Mother said most of boyfriend's testimony was a lie, although they did meet in August 2016, cable was in his name and they did have sex. Mother also knew boyfriend had been on Methadone since 2015.

{¶ 100} At the shelter, "it was a small room and it was disgusting * * * me and my kids started getting full-body rashes, sores, everything. It was horrible --." Mother believed they had scabies, but they did not, they had a severe allergic reaction to mold. Mother had to bleach the mattresses and "scrub the beds because they said they couldn't give me new beds" and "had to bag up all of my stuff, clean or dirty. And they had a urine problem." Kam.K. and J.K. wet the bed anytime they moved and "they both wet four of their beds. * * * we had to sign up to wash. So that day was already full." Mother said when she informed the shelter about the mold, "they denied it and they wouldn't give me new mattresses and I reported them * * * to the Health Department." Mother said the children went to school every day and were in "uniforms and clean. You just start the day right when you're clean." Mother said the shelter workers said the bags were garbage, but the bags were clean and dirty laundry which sat for over a week.

{¶ 101} At the December 7, 2016 meeting, mother admitted that she denied having contact with boyfriend after the domestic violence incident. After the jail tapes were

32.

produced, mother panicked because "it was almost like I just wasted five years fighting and I let it get messed up by a stupid phone call. So I did lie." Mother said it was poor judgment to talk to boyfriend while he was in jail, as appellee had told her not to talk to him. She felt bad for boyfriend and guilty because she abandoned him when he relapsed. Mother was asked to leave the shelter after the children were removed because of the jail calls with boyfriend.

{¶ 102} Mother testified after the four children were removed in December 2016, she did not see the children during the holidays because there was no space for the visits. Mother was homeless for a period of time but claims she continued to stay in contact with appellee. Mother arranged services and visits in January 2017, after the holidays.

{¶ 103} With respect to substance abuse, mother admitted using marijuana but said she obtained a medical marijuana card in about May 2017. Mother uses marijuana once or twice a week for severe anxiety, PTSD and depression. Mother does not use marijuana in front of her children, nor does she smoke cigarettes in front of them. After the children would go to bed, mother would sometimes vape marijuana in her room. She did not smoke marijuana with boyfriend, and boyfriend did not smoke marijuana at mother's apartment when the children were there. Mother took either Percocet or Oxycodone, which she obtained from a resident of the shelter, for a severe impacted tooth. Mother did not have a prescription for the drug.

{¶ 104} At the time of trial, in August 2017, mother was working, had a vehicle and lived in a four bedroom house on Cambridge with utilities in her name. Mother had

33.

HEAP, which is government subsidized funding for utilities. Mother believed she could provide the children with stability so long as she could work and appellee would give her some freedom. The children all "have above intelligence * * [t]hese aren't crazy kids that -- the most traumatic thing is being separated." Mother agreed it took more than love to raise children. Since the beginning of the case, mother lived in eight places. Mother visits with her children once a week for two hours and has only missed one visitation due to her work.

{¶ 105} When asked about driving, mother said she had a car for two weeks and was able to drive. She was asked if she had a driver's license, and mother acknowledged the license she has was issued in August 2016, and says non-driver on it. Mother stated it was her state ID, but she has an active license "now after I paid my fines. I didn't actually get my license. * * * Now I have to actually go swap it out."

{¶ 106} Mother said she understood the importance of the children's counseling and therapies and said although she did not attend months of Ju.K.'s therapies, "it's not my choice that I missed them. It's by necessity. I have to keep my house and I have to keep up on my child support and have a lawyer represent me correctly instead of just jumping down the hoops." Mother also did not have a car. Mother said she will not have to work so much once she does not have to pay child support and her lawyer. Mother also said once the children are in her care, she will be eligible for medical transportation.

34.

**{¶ 107}** Mother did not disclose boyfriend to appellee because "it wasn't like he was involved in my services or my case plan or my kids. So after he started kind of going downhill, I was going to sever it off."

**{¶ 108}** Mother testified she was never in a physically abusive relationship, only a financially abusive relationship, despite what the court had previously found. When asked, mother did not agree that her relationship with boyfriend was detrimental and not in the best interest of the children, because she always made sure her children were safe; the children were never in the apartment when boyfriend was there.

<strong>Trial Court's Decision</strong>

**{¶ 109}** In its October 10, 2017 judgment entry, the trial court noted that on August 25, 2017, it found that appellee had met its burden, and awarded permanent custody of the five children (not including J.K.) to appellee. The court set forth certain findings, by clear and convincing evidence, including: mother moved to Lucas County due to domestic violence with the father of two of her children; mother has unresolved sexual abuse issues; mother was inconsistent in attending mental health appointments; mother smokes marijuana; mother's housing is not stable as she has lived in eight different locations in four years; mother was unable to regularly engage in children's services; mother does not believe her children act out sexually; mother does not understand the importance of keeping the children in counseling as she thought the children needed a break from services; mother has difficulty handling five children during visitations; and, mother is unable to handle four children at home.

35.

{¶ 110} Other findings included:  in October 2016, appellee received a referral regarding domestic violence concerns with mother's boyfriend; Kam.K. said boyfriend hit the children, tore up their clothes, smashed walls and the television and threatened to shoot mother and the children; Kam.K. was afraid of boyfriend; appellee was not aware of boyfriend until appellee received the referral; mother knew boyfriend was a recovering drug addict; mother admitted boyfriend spent the night with her four or five times; mother stated boyfriend broke into her home and destroyed it so mother and children moved to a shelter; and, mother claimed she ended the relationship with boyfriend.

{¶ 111} Further findings consisted of boyfriend's testimony that:  he stayed with mother for several weeks and there was no electricity in the apartment except for electricity from an extension cord plugged in in the hall; he smoked marijuana with mother in the bedroom and the children would come in while they were smoking; he shot up heroin in the bathroom of mother's apartment; he had a key to the apartment and paid for the cable bill; he saw an eviction notice on the door; and, he had contact with mother after she moved to the shelter as she accepted his calls from jail.

{¶ 112} Other findings included:  after the children were removed and mother was asked to leave the shelter, her room at the shelter was in a deplorable condition, with garbage bags and a strong stench of urine.

{¶ 113} The court found:  mother did not appreciate the lack of security and potential safety risk to which she exposed her children; mother's relationship with

36.

boyfriend was clearly inappropriate and boyfriend should not have been around the children; and, mother admitted she smoked marijuana when the children were in her care.

{¶ 114} The court further found all of the children have special needs and each child's needs were being met by caregivers in their placements.

{¶ 115} The court further found:  under R.C. 2151.414(B)(1)(a) and (E)(1), mother did not participate in substance abuse treatment or domestic violence counseling, and just started mental health counseling, mother failed to undergo drug testing when requested to do so and mother's housing remained unstable; under R.C. 2151.414(B)(1)(a) and (E)(4), mother demonstrated a lack of commitment toward the children by failing to regularly support, visit, or communicate with them when able to do so, by not attending Kai.K. and Ju.K.'s medical and counseling appointments and by having an ongoing relationship with a man who was a danger to her and the children; and, under R.C. 2151.414(B)(1)(a) and 2151.414(E)(10), four of the fathers legally abandoned their children by failing to have contact for 90 days, and by failing to provide physical, emotional or financial support for the children.

{¶ 116} The trial court also found, pursuant to R.C. 2151.414(D)(1)(a), (d) and (e), an award of permanent custody to appellee was in the best interest of the children, would provide them with a legally secure placement, and the children's needs were being met in their placements.

{¶ 117} The court further found:  pursuant to R.C. 2151.414(B)(1)(a) and 2151.414(E)(1), (2), (4) and (10), the children cannot and should not be placed with

37.

either parent within a reasonable period of time; appellee made reasonable efforts to prevent the removal of the children from the home, which efforts were unsuccessful; appellant was offered services to remedy the conditions which caused the children to be removed from the home, but the conditions were not remedied; and, appellee made reasonable efforts to finalize a permanency plan.

{¶ 118} Lastly, the court observed the guardian ad litem recommended permanent custody of the five children be awarded to appellee, as it was in the children's best interest.

### The Appeal

### Standard—Permanent Custody

{¶ 119} A trial court's decision in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11, citing *In re Andy-Jones*, 10th Dist. Franklin Nos. 03AP-1167 and 03AP-1231, 2004-Ohio-3312, ¶ 28. The trial court's factual findings are presumed correct since, as the trier of fact, the court is in the best position to weigh the evidence and evaluate the witnesses' testimony. *In re Brown*, 98 Ohio App.3d 337, 342, 648 N.E.2d 576 (3d Dist.1994). Furthermore, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19, 526 N.E.2d 1350 (1988). Therefore, a judgment supported by some competent, credible evidence going to all essential elements

of the case is not against the manifest weight of the evidence. *Id.*; *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

{¶ 120} The juvenile court may grant permanent custody of a child to a children services agency if the court finds, by clear and convincing evidence: (1) the existence of at least one of the four factors set forth in R.C. 2151.414(B)(1)(a) through (d), and (2) the child's best interest is served by granting permanent custody to the agency. *In re M.B.*, 10th Dist. Franklin No. 04AP755, 2005-Ohio-986, ¶ 6. Clear and convincing evidence requires proof which "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 121} R.C. 2151.414(B)(1)(a) provides that "the child cannot be placed with either parent within a reasonable period of time or should not be placed with either parent." In order for the trial court to determine whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence presented at a hearing. R.C. 2151.414(E). If the court then determines, by clear and convincing evidence, that any one of sixteen factors are met, the court shall find that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(E)(1)-(16).

39.

{¶ 122} The relevant portions of R.C. 2151.414(E) state:

* * *

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.  In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing * * *;

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child

when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

* * *

(10) The parent has abandoned the child.

{¶ 123} In making a best interest determination, R.C. 2151.414(D)(1) provides that the court shall consider all relevant factors, including, but not limited to:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

41.

{¶ 124} The factors set forth in R.C. 2151.414(E)(7) through (11) include: whether medical treatment or food has been withheld from the child; whether the parents have placed the child at a substantial risk of harm due to alcohol or drug abuse, and have rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan was journalized as part of a dispositional order issued with respect to the child; and, whether the parents have abandoned the child.

**First Assignment of Error**

{¶ 125} Mother argues the trial court's finding that the children could not be placed with her within a reasonable time was against the manifest weight of the evidence as mother completed services and had the children in her care for over a year with protective supervision. Mother asserts the only reason the children were removed was because of her two month long relationship with boyfriend. After boyfriend destroyed the home, mother maintains she called the police and pressed charges. Mother acknowledged she was not completely honest with appellee, but insists she took the proper steps to keep her children safe. Mother claims when the children were in her care at the shelter, the children were dressed appropriately and the staff had no concerns with mother's care of her children. Mother contends she has a stable home with four bedrooms, she is bonded with her children and she has completed all of the services requested of her.

{¶ 126} A review of the record shows appellee was initially involved with mother and her children in 2012, for domestic violence issues, the children's sexualized

42.

behaviors, parenting issues, the need for housing for the family and employment for mother. The record reveals and the trial court found five of the children have been in and out of care for four years and Ju.K. has never lived with mother. The record further reveals and the court found mother has trouble maintaining stable housing, as she has lived at at least eight different addresses in four years.

{¶ 127} The record shows and the court found mother's involvement in services during the four years of the case was inconsistent. The record reveals mother did not keep appellee apprised of her relationships with men. In addition, mother did not comply with the majority of the drug testing requests, nor did she participate in substance abuse treatment or domestic violence counseling. Mother admitted, during the jail calls, that she obtained Percocet or Oxycodone from another resident of the shelter by trading a meal. This occurred while four of mother's children were in her care; mother sounded under the influence when she was talking with boyfriend, with the children in the background.

{¶ 128} The record reveals and the court found mother did not appreciate the lack of security and the potential safety risk to which she exposed the children due to mother's clearly inappropriate relationship with boyfriend, who was a recovering addict. The court further found mother's testimony was not credible.

{¶ 129} The record shows there were also concerns about mother's inability to handle her four or five children at one time, either at home or during visits. In addition, mother did not regularly involve herself in the children's lives, such as attending therapy

43.

sessions and other appointments. Finally, when some of the children displayed aggressive and sexualized behaviors, mother blamed the behaviors on the children being in the foster care system rather than educating herself about their behaviors or acknowledging their behaviors occurred due to events which happened when the children were in her care.

{¶ 130} The court found mother has not changed her lifestyle to provide a safe home for the children, and the children cannot be expected to wait forever for mother to change so they can be reunited with her. The court found all of the children had special needs, and the children's needs were being met in their placements. The court also found an award of permanent custody would provide the children with a legally secure placement and will facilitate an adoptive placement. The court further found and the record shows the GAL recommended an award of permanent custody to appellee as being in the children's best interest.

{¶ 131} With respect to the four fathers of the five children, they did not participate in case plan services or attend hearings. The court found the children's fathers failed to visit or maintain contact with the children, thus legally constituting abandonment.

{¶ 132} Based on our review of the record as summarized above, we find, as to the first prong of the permanent custody analysis, there is clear and convincing evidence in the record to support the court's determination that pursuant to R.C. 2151.414(B)(1)(a), the children cannot be placed with mother within a reasonable time, because, despite

reasonable case planning and diligent efforts by the agency, mother has failed to substantially remedy the conditions which caused the children's removal. There is also clear and convincing evidence in the record to support the court's finding that, pursuant to R.C. 2151.414(B)(1)(b), the fathers of the five children have abandoned the children.

{¶ 133} As to the second prong of the permanent custody analysis, we find the record contains clear and convincing evidence to support the court's determination that an award of permanent custody to appellee is in the best interest of the children. We further find the court's judgment is not against the manifest weight of the evidence. Accordingly, mother's first assignment of error is not well-taken.

**Second Assignment of Error**

{¶ 134} Mother argues the trial court's finding that the children could not be placed with her was against the manifest weight of the evidence as the court improperly considered mother's marijuana use. Mother contends she has a medical marijuana card which is legal in the state of Ohio and she was taking her medication as prescribed. Mother also claims she was never under the influence and acting inappropriately in her children's presence when she was using marijuana, nor did she adversely interact with her children due to her marijuana use. Mother asserts the court's consideration of her marijuana use is a misinterpretation of Ohio law since marijuana is no longer an illegal drug if it is prescribed. Mother cites to R.C. 3796.22 in support of her position.

{¶ 135} R.C. 3796.22, which became effective on September 8, 2016, states in pertinent part:

45.

(A) Notwithstanding any conflicting provision of the Revised Code, a patient registered under this chapter who obtains medical marijuana from a retail dispensary licensed under this chapter may do both of the following:

(1) Use medical marijuana;

(2) Possess medical marijuana, * * *;

(3) Possess any paraphernalia or accessories specified in rules adopted under section 3796.04 of the Revised Code.

* * *

(C)  A registered patient shall not be subject to arrest or criminal prosecution for doing any of the following in accordance with this chapter:

(1) Obtaining, using, or possessing medical marijuana;

(2) Possessing any paraphernalia or accessories specified in rules adopted under section 3796.04 of the Revise Code. * * *

{¶ 136} Here, a review of the record, including the evidence submitted by mother as well as her trial testimony, shows the trial court did not improperly consider mother's marijuana use in finding that the children could not be placed with mother.   Mother did not establish that she had a prescription for medical marijuana during the time that she was using marijuana while four of her children were in her care, August through October 2016.  In addition, mother did not demonstrate that she obtained her medical marijuana from a licensed retail dispensary.  Further, there is no evidence that mother could responsibly use marijuana while effectively parenting her children.  Moreover, the court's

46.

consideration of mother's marijuana use was merely one factor in many that it used to determine that the children could not be placed with mother. Accordingly, mother's second assignment of error is not well-taken.

{¶ 137} The judgment of the Lucas County Court of Common Pleas, Juvenile Division, is hereby affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Arlene Singer, J.

Christine E. Mayle, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.